FILED
CHARLOTTE, NC

OCT 10 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

Jahlil I. Kure,

Plaintiff,

v.

TransUnion LLC

Defendant.

Jury Trial Demand

Case No. 3:25-cv-786-KDB

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    This is an action for damages and injunctive/equitable relief brought by Plaintiff Jahlil I. Kure against Defendant TransUnion LLC ("TransUnion") for willful and negligent violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

2.    TransUnion, a consumer reporting agency, failed to maintain reasonable procedures to assure maximum possible accuracy of the information in Plaintiff's credit file, in violation of 15 U.S.C. § 1681e(b).

3. After receiving multiple disputes and complaints (including via the Consumer Financial Protection Bureau ("CFPB")), TransUnion failed to conduct reasonable reinvestigations and continued reporting inaccurate information, in violation of 15 U.S.C. § 1681i.

4. As a direct result, Plaintiff was denied credit (including housing and auto financing), incurred an auto insurance premium increase of $300 per month (approximately $3,600 per year), and suffered significant economic, reputational, and emotional harm.

## II.      JURISDICTION AND VENUE

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331, as the claims arise under the FCRA.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) and 15 U.S.C. § 1681p because Plaintiff resides in Mecklenburg County, North Carolina, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.      PARTIES

7. Plaintiff Jahlil I. Kure is a natural person who resides in Charlotte, North Carolina, and is a "consumer" within the meaning of 15 U.S.C. § 1681a(c).

8. Defendant TransUnion LLC is a Delaware limited liability company with principal offices in Chicago, Illinois, and is a "consumer reporting agency" within

the meaning of 15 U.S.C. § 1681a(f). Defendant may be served through its registered agent in North Carolina: CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Initial Discovery of Errors

9. On June 25, 2024, Plaintiff's application for an auto loan was denied, preventing him from purchasing a replacement business vehicle after his prior vehicle broke down. Without transportation, Plaintiff could not perform day-to-day business operations. Plaintiff is informed and believes, and thereon alleges, that the denial was based in whole or in part on information contained in a consumer report, including a report prepared by TransUnion.

10. On or about July 18, 2024, Plaintiff obtained his TransUnion consumer disclosure file, which revealed multiple serious inaccuracies, including duplicate tradelines, contradictory open/closed and past-due/charge-off statuses, improper "charge-off" re-aging, and incorrect Date of First Delinquency ("DOFD") reporting.

11. On August 4, 2024, Plaintiff mailed a detailed written dispute to TransUnion via certified mail and the same day, filed a CFPB complaint attaching supporting documentation.

12. On or about August 29, 2024, TransUnion issued reinvestigation results falsely stating the inaccurate information had been "verified as accurate."

13. The June 25, 2024, denial prevented Plaintiff from replacing his business vehicle. Without transportation, Plaintiff was forced to shut down his business and cease providing services.

14.  Plaintiff suffered cascading financial harm, including lost income and profits, late charges, housing disruption, and damage to business goodwill and reputation.

15.  Plaintiff also suffered emotional distress, including stress, anxiety, and chest tightness. On September 15, 2025, a treating physician documented that Plaintiff's stress and anxiety were directly tied to credit denials and financial strain.

### B.   Plaintiff's Continued Efforts to Correct Errors

16.  Between September 15–17, 2024, Plaintiff mailed certified dispute letters addressing specific tradelines (including Capital One, Navy Federal, American Express, and Chrysler Capital). USPS records confirm delivery.

17.  Plaintiff filed corresponding CFPB complaints. Despite CFPB oversight, TransUnion mailed reinvestigation results in October 2024 stating accounts were "verified" or "updated," while leaving the fundamental inaccuracies intact.

18.  On December 25–26, 2024, Plaintiff filed additional CFPB complaints regarding the same accounts. In January 2025, TransUnion again issued "verified" reinvestigation results.

19.  On March 26, 2025, and June 4, 2025, Plaintiff obtained new TransUnion disclosures showing that the same disputed inaccuracies persisted, confirming TransUnion's systemic failure to conduct reasonable reinvestigations.

### C.  Specific Inaccuracies

20. **American Express:**
a. Reported simultaneously as "open" and "closed."
b. Labeled "Terms: Paid Monthly" on a revolving credit card.
c. Continued reporting inflated high balance ($15,698) after closure.
d. Improper repetitive monthly "charge-off" coding across 2024–2025, unlawfully re-aging the account.
e. Incorrect removal date (05/2030) inconsistent with DOFD.

21. **Capital One (Acct. ending 9427) (Exhibit A-2):**
a. "Terms: Paid Monthly" on a revolving account.
b. Continued Past Due = $3,468 each month post-charge-off.
c. Repetitive "charge-off" coding into 2025 after closure.
d. "High balance" equaled the charge-off balance, misrepresenting utilization.
e. Removal date 09/2030 inconsistent with DOFD.

22. **Chrysler Capital (Acct. ending 41328) (Exhibit A-3):**
a. Reported "Charge-Off" but continued Past Due = $19,552 month after month.
b. Contradictory fields: "Monthly Payment $0 / Terms $0 for 72 months."
c. "High balance" decreased from $27,764 to $22,137—impossible by definition.
d. Continued re-aging with repetitive monthly "charge-off" notations after closure.
e. Removal date 05/2030 inconsistent with DOFD.

23. **Navy Federal Auto Loan #1 (Exhibit A-4):**
a. Reported in duplicate with two tradelines for the same obligation.
b. Both listed Past Due = $30,591 post-charge-off.
c. Both carried repetitive monthly "charge-off" coding.
d. "Terms $0 per month" despite being installment loans.
e. Removal date 05/2030 inconsistent with DOFD.

24. Navy Federal Auto Loan #2 (Exhibit A-5):
a. Also reported in duplicate.
b. Both tradelines showed Past Due = $12,850 post-charge-off.
c. Repetitive monthly "charge-off" notations (re-aging).
d. "High balance" ($12,490) less than current balance ($12,850).
e. Removal date 05/2030 inconsistent with DOFD.


25. Vive Financial (Exhibit A-6):
a. Reported "Paid, closed; was Paid as agreed" while still showing a 30-day late.
b. Listed "Terms: Paid Monthly" on a revolving account.
c. Reported high balance greater than the credit limit without verification.


## V.      Resulting Harm


26. As a direct and proximate result of Defendant's misconduct, Plaintiff suffered the following injuries and damages:


27. On June 18, 2025, Plaintiff was denied a mortgage despite otherwise qualifying, depriving him of home ownership opportunities and forcing him to remain in rental housing.


28. Plaintiff was required to pay inflated and unreasonable rent as a direct consequence of being denied a mortgage, resulting in financial instability and inability to build equity.

29. On September 16, 2025, Plaintiff was denied auto financing by Tesla Finance due to TransUnion's inaccurate reporting, preventing him from obtaining reliable transportation.

30. Plaintiff was forced to rely on Uber and other rideshare services to commute to work and attend to daily responsibilities, causing substantial and recurring transportation costs.

31. Plaintiff's business was shut down due to lack of reliable transportation, resulting in loss of contracts, income, profits, and goodwill.

32. Plaintiff's impaired credit limited access to higher-paying jobs and restricted his professional advancement, as certain employers require clean credit reports and stable transportation.

33. Plaintiff's auto insurance premium increased by approximately $300 per month ($3,600 annually) as a direct result of Defendant's inaccurate and derogatory reporting.

34. Plaintiff experienced cascading financial harm, including late fees, penalties, and disruption of housing stability, stemming from credit denials and inaccurate reporting.

35. Plaintiff has endured emotional distress, anxiety, humiliation, and embarrassment, manifested in physical symptoms such as chest tightness and stress, as confirmed by a treating physician.

36. Plaintiff has suffered reputational harm through the publication of false credit information to lenders, insurers, and other third parties, damaging his perceived creditworthiness and financial reliability.

37. Plaintiff was denied access to competitive credit cards and lines of credit that would have offered 0% promotional APRs, forcing him to rely on inferior and costly credit alternatives.

38. Plaintiff lost the opportunity to refinance existing debt at lower interest rates due to false derogatory information, resulting in higher monthly payments and long-term financial loss.

39. Plaintiff incurred higher security deposits for utilities and housing because inaccurate reports labeled him as a greater credit risk.

40. Plaintiff was precluded from pursuing additional business ventures that required start-up credit lines, limiting his entrepreneurial opportunities and growth.

41. Plaintiff suffered disruption of family and personal relationships due to the financial stress caused by Defendant's misconduct, straining household stability.

42. Plaintiff experienced repeated denials for retail store credit and financing promotions, restricting his ability to purchase essential items on fair terms.

43. Plaintiff's ability to relocate or secure alternative housing was impaired, as landlords and property managers relied on Defendant's inaccurate reports.

44. Plaintiff lost professional credibility when employers or potential business partners became aware of false derogatory information, limiting career advancement.

45. Plaintiff incurred repeated costs in time, money, and resources preparing and sending certified disputes, filing CFPB complaints, and attempting to correct Defendant's misconduct.

46. Plaintiff's financial planning and long-term wealth-building were materially impaired, as he could not qualify for mortgage credit to build equity or favorable financing to acquire appreciating assets.

47. Plaintiff was subjected to embarrassment and humiliation when explaining repeated denials of credit, damaging his self-confidence and professional image.

48. Plaintiff's mental health suffered, with prolonged anxiety, frustration, and sleep disruption directly traceable to Defendant's misconduct.

49. Plaintiff endured a loss of trust in the financial system and credit marketplace, leading to diminished consumer confidence and fear of future denials.

50. Plaintiff continues to suffer ongoing and compounding damages, as the inaccurate information remains in circulation, perpetuating harm each time his credit report is furnished to third parties.

## VI.    Pattern and Practice of Misconduct

51. Publishing duplicate tradelines for the same account, inflating derogatory impact.

52. Issuing boilerplate "verified as reported" dispute outcomes without meaningful analysis.

53. Uncritically parroting furnisher responses through automated ACDV workflows, ignoring consumer documentation.

54. Re-aging delinquencies via repetitive monthly "charge-off" codes to extend reporting periods.

55. Misclassifying closed accounts as open or active, creating false derogatories.

56. Publishing inter-bureau inconsistencies, with data differing significantly from Experian/Equifax.

57. Failing to note consumer disputes, in violation of 15 U.S.C. § 1681i(c).

58. Conducting unreasonably cursory reinvestigations that disregard evidence provided by consumers.

59.  Continuing to publish contradictory fields (e.g., "closed" accounts showing monthly payment obligations).

60.  Reporting inflated "high balances" that exceed actual credit limits or balances owed.

61.  Misreporting installment loans as revolving accounts, thereby skewing utilization ratios.

62.  Classifying soft inquiries as hard inquiries, damaging consumer credit scores.

63.  Failing to remove inquiries or tradelines even after furnishers requested deletion.

64.  Providing incomplete reinvestigation results that omit verification sources or methods used.

65.  Failing to timely update or delete inaccurate accounts despite multiple consumer disputes.

66.  Reporting removal dates inconsistent with the Date of First Delinquency, unlawfully extending derogatory items beyond the 7-year statutory period.

67. Using automated dispute processes that suppress or ignore attachments and supporting evidence.

68. Withholding consumer statements of dispute from subsequent reports sent to third parties.

69. Failing to implement adequate quality-control procedures despite repeated lawsuits, settlements, and CFPB enforcement actions highlighting systemic issues.

## VII.  Prior Settlements & Regulatory Scrutiny

70. Norman v. TransUnion, LLC – TransUnion was a defendant in a federal class action (*Norman v. TransUnion, LLC*) alleging systemic FCRA violations relating to dispute handling of hard inquiries. That case resulted in a $23 million settlement, reflecting widespread consumer harm. Plaintiff himself received a settlement payment in Norman, evidencing his inclusion among consumers injured by TransUnion's practices.

71. Ramirez v. TransUnion LLC – In *Ramirez v. TransUnion*, a federal jury in the Northern District of California awarded $60 million against TransUnion after finding willful violations of the FCRA when TransUnion improperly labeled thousands of consumers as potential terrorists or criminals. The Ninth Circuit and U.S. Supreme Court both addressed issues in the case, keeping TransUnion under national scrutiny. This landmark verdict underscores that TransUnion has long been aware of its FCRA obligations yet persists in systemic violations.

72. **CFPB v. TransUnion and John Danaher (President of TransUnion)** – In 2022, the Consumer Financial Protection Bureau (CFPB) sued TransUnion and its then-executive for deceptive marketing of credit products and failure to comply with a 2017 consent order. The CFPB alleged TransUnion engaged in "dark patterns" to trick consumers into costly subscriptions. Although a subsequent CFPB enforcement action was dismissed in February 2025, the agency's repeated pursuit of TransUnion demonstrates ongoing regulatory concern with its misconduct.

73. **FTC Enforcement Actions** – TransUnion has historically been subject to enforcement actions by the Federal Trade Commission for deceptive practices, including failures in consumer disclosures and misleading marketing. These actions further prove TransUnion's notice of compliance obligations under federal consumer protection laws.

74. **Multiple Class Actions Nationwide** – TransUnion has faced numerous FCRA class actions across federal districts for failure to assure maximum possible accuracy, improper dispute reinvestigations, re-aging of accounts, and misreporting of bankruptcies. Settlements and adverse rulings in these cases further establish a pattern of misconduct.

75. **Industry-Wide Notice** – Through consent decrees, settlements, CFPB investigations, and jury verdicts, TransUnion has been repeatedly placed on notice that its dispute-handling procedures, reporting systems, and consumer disclosures fail to comply with the FCRA.

76. **Taken together, these prior settlements and regulatory enforcement actions** establish a pattern of misconduct and demonstrate that TransUnion has actual knowledge of its obligations under the FCRA. Despite this, TransUnion continues to engage in the very same violations that harmed Plaintiff, proving that its conduct is willful within the meaning of 15 U.S.C. § 1681n.

# VIII.    DAMAGES

As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered significant and multi-faceted damages, including but not limited to:

77. **Credit-Related Losses**
    a.    Denials of credit for a mortgage, auto loans, credit cards, and other lending products.
    b.    Loss of access to competitive financing options such as 0% APR or low-interest promotional credit lines.
    c.    Increased interest rates and unfavorable terms on any credit that Plaintiff was able to obtain, resulting in long-term financial loss.
    d.    Inability to refinance existing obligations at lower rates, causing Plaintiff to pay more than he otherwise would have.

78. **Transportation and Business Losses**
    a.    Denial of auto financing, which left Plaintiff unable to replace his vehicle, effectively shutting down his business and depriving him of income, profits, and goodwill.
    b.    Recurring expenses for transportation, including Uber/Lyft rides to work and daily responsibilities, which caused continuing financial strain.
    c.    Loss of entrepreneurial opportunities and new business ventures that required vehicle financing and lines of credit.

79. **Housing and Living Costs**
    a.    Denial of a mortgage, forcing Plaintiff to remain in rental housing and incur inflated and unreasonable rental costs.
    b.    Higher security deposits for utilities and housing because of Defendant's inaccurate reporting.

    c.    Impaired ability to relocate or secure alternative housing, as landlords and property managers relied on inaccurate credit reports.

80. **Insurance Costs**
    a.    An increase of approximately $300 per month ($3,600 annually) in auto insurance premiums, which directly flowed from Defendant's inaccurate and derogatory reporting.

81. **Employment and Career Harm**
    a.    Restricted access to higher-paying employment opportunities where reliable credit history and transportation are prerequisites.
    b.    Loss of professional credibility and diminished opportunities when false derogatory information was revealed to employers and business partners.

82. **Out of Pocket Expenses**
    a.    Substantial costs incurred for certified mail, postage, document preparation, and supplies in disputing Defendant's misconduct.
    b.    Time and resources expended filing CFPB complaints, preparing dispute packages, and monitoring credit reports.

83. **Emotional, Physical, and Reputational Harm**
    a.    Emotional distress, including humiliation, embarrassment, frustration, and loss of confidence.
    b.    Anxiety, stress, and chest tightness tied directly to credit denials and financial strain, as documented by a treating physician.
    c.    Sleep disruption and ongoing mental anguish caused by Defendant's repeated failure to correct inaccuracies.

d.  Reputational harm through the dissemination of false information to lenders, insurers, landlords, and employers, damaging Plaintiff's perceived financial reliability.

## IX.  PRAYER FOR RELIEF

84.  **Actual Damages – Awarding Plaintiff actual damages as provided under 15 U.S.C. § 1681o for Defendant's negligent violations of the FCRA.**

85.  **Statutory Damages – Awarding Plaintiff statutory damages as provided under 15 U.S.C. § 1681n for Defendant's willful violations of the FCRA.**

86.  **Punitive Damages – Awarding punitive damages under 15 U.S.C. § 1681n to punish Defendant for willful violations of the FCRA and to deter future misconduct.**

87.  **Treble Damages – Awarding treble damages pursuant to N.C. Gen. Stat. § 75-16 for Defendant's unfair and deceptive trade practices under North Carolina law.**

88.  **Equitable and Injunctive Relief – Granting appropriate equitable and injunctive relief, including but not limited to:**
**i. An order requiring Defendant to delete, block, or correct all inaccurate, unverifiable, and misleading information from Plaintiff's consumer report;**
**ii. An order requiring Defendant to adopt and implement reasonable procedures to assure maximum possible accuracy in Plaintiff's file;**
**iii. An order requiring Defendant to include Plaintiff's dispute statements in all consumer reports furnished to third parties until the disputed items are corrected or deleted.**

89.  **Costs and Fees – Awarding Plaintiff the costs of litigation as provided by law.**

**90. Interest** – Awarding pre- and post-judgment interest as permitted by law.

**91. Further Relief** – Granting such other and further relief as the Court deems just, proper, and equitable in the interests of justice.

## X.    JURY DEMAND

**92. Plaintiff demands trial by jury on all issues so triable.**

---

Respectfully submitted,

/s/ Jahlil I. Kure
Jahlil I. Kure
7120 South Line Drive, Apt. 501
Charlotte, NC 28212
(862) 408-0384
kure.jahlil4@gmail.com